# Exhibit 1

# Deposition of George Spadaro

Volume: I
Pages: 1 to 76
Exhibits: See Index

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
Case No. 4:22-CV-00424-MWB

GERARD JACKSON, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

LOCUST MEDICAL, LLC,

Defendant.

VIRTUAL DEPOSITION OF GEORGE SPADARO, a witness called on behalf of the Plaintiff, taken pursuant to Federal Rules of Civil Procedure, before Susan E. DiFraia, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, on Friday, April 28, 2023, commencing at 9:00 a.m.

APPEARANCES:

PARONICH LAW, P.C
350 Lincoln Street, Suite 2400
Hingham, MA 02043
BY: Anthony Paronich, Esquire
E-Mail: Anthony@paronichlaw.com
Attorney for the Plaintiff.

DEBOEF LUCCHESI & ASSOCIATES
1402 South Atherton Street
State College, PA 16801
BY: Faith M. Lucchesi, Esquire
E-Mail: Lucchesi@dla.com
Attorney for the Defendant.

* * * * *



EXAMINATIONS

| Witness | | Page |
|---|---|---|
| GEORGE SPADARO | | |
| DIRECT EXAMINATION | BY MR. PARONICH | 4 |
| CROSS EXAMINATION | BY MS. LUCCHESI | 70 |
| REDIRECT EXAMINATION | BY MR. PARONICH | 71 |

EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| 1 | Notice of Taking Deposition | 11 |
| 2 | 34 Page PDF | 52 |



PROCEEDINGS

GEORGE SPADARO

a witness called for examination by counsel for the Plaintiff, having been satisfactorily identified by the production of his driver's license and being first duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARONICH:

Q. Okay. Mr. Spadaro, I introduced myself off the record but I'll do it on the record as well. My name is Anthony Paronich, and I'm lead trial counsel for the plaintiff in this lawsuit. Have you ever your deposition taken before?
A. Never, no.
Q. So then I'll just go over some basic ground rules that will help us get through this as efficiently as possible. Okay even though we're in this informal setting over Zoom you just took an oath and your testimony here today is going to be under oath as if it were in a courtroom, do you understand that?
A. Absolutely.



Q. I'll ask you a series of questions like you did just there, we just need your answers to be clear and verbal. Maybe it's the Northeast in me, maybe it's just my personality, but I have a tendency to nod my head a lot or answer someone's question before asking it. And if you think of a deposition it would be a really difficult book to read if we constantly interrupt each other. So does it make sense for you to give your answer to my question when I finished my question?
A. Yes.
Q. Again, if we're reading a book at the end of today we can only know that you didn't understand the question. So you should let us know that because then it becomes my obligation to ask a more clear question; does that make sense?
A. Understood, yes.
Q. Another rule here, you can take a break for any reason. You don't need to tell the reason. You could spill a cup of coffee and need a couple of minutes, but all you need to do is just tell me you need to take a break. The



MAGNA LEGAL SERVICES

only caveat to that is if I ask you a question we like to get an answer to the question and then we go off the record. Does that make sense?
A. Yes.
Q. From time to time your attorney may object to questions I ask. That's absolutely her right as your counsel. But in a way this is more difficult than if we were in a courtroom or if you've seen courtroom scenes on TV. There's an objection that can be made for the record but unless your attorney instructs you not to answer, you still answer the question. Does that make sense?
A. Yes.
Q. So is there any reason today that you aren't able to give truthful or accurate testimony?
A. No.
Q. And are you currently under indictment for any crime?
A. No.
Q. And are you taking any medications that you believe would affect your ability to testify today or remember anything?



A. No.
Q. Okay. Now that's our background. And we'll get into it. Where do you currently work?
A. Locust Medical.
Q. Is that your only employment currently?
A. That's correct, yes.
Q. How long have you worked at Locust?
A. Since 2020.
Q. And what is your current position?
A. I am the owner.
Q. And have you been the owner since 2020?
A. That's correct.
Q. Does Locust Medical have other employees?
A. Yes, it has employees.
Q. How many?
A. Two.
Q. What are those other employee's names?
A. Ashley McReynolds and Megan Thompson.
Q. And is it McReynolds?
A. McReynolds, correct, yes.
Q. And what do they do for Locust Medical?
A. So they are customer services representatives meaning they answer phone calls and they also work with physicians and they also do order



placement, logistics and just any type of office work.
Q. And before working at Locust Medical did you have another job?
A. Not really, I did freelancing mostly.
Q. Understood. Generally what type of freelancing did you do?
A. Cleaning services. So I did -- I have a medical background but I did a lot of cleaning services.
Q. And when you say you have a medical background what do you mean by that?
A. I went to nursing school and just continued along that path to become a doctor but change of plans.
Q. And that change of plans did that mean you got into more of the medical cleaning business?
A. Yes, exactly.
Q. And what did Locust Medical do?
A. Okay. Locust Medical is a supplier of medical goods.
Q. And is there any specific type of medical goods that -- let me strike that. Is there a general type of medical goods that Locust Medical



supplies?
A. It's mostly towards diabetic supplies.
Q. Understood. And so when you were working in the medical cleaning industry did you have a focus on diabetic supplies?
A. No, I just had experience working in diabetics but when you're in medical you typically work across many different departments, pediatrics, pulmonary, so it just depends on where you get assigned to.
Q. Understood. And how did you get the idea to start Locust Medical?
A. Well, I've just had the -- like I said I've been in the medical doing that and there was a need for supplies. The local supplier had closed their doors and there was nobody supplying the area so I discussed with some of the local hospitals and doctors and decided to open up something to start supplying regions that were not accessible to some people.
Q. And when you say the local supplier in the area, what area is that?
A. Well, for this particular area pretty much eastern US, okay, like west Virginia, Virginia,



MAGNA LEGAL SERVICES

going into Ohio, Pennsylvania where people who -- would have to drive maybe three or four hours for local supplies.
Q. Understood. So I think another important instruction as we get into the deposition today is that no matter what my questions are they're never seeking information or conversations you've had with your attorney. So conversations you've had with your attorney are not part of the public record and they're private. So do you understand that?
A. I understand.
Q. Okay. So then other than speaking with your attorney what did you do to prepare for today's deposition?
A. Nothing. I've made mental notes of everything that I can recall.
Q. Did you say mental notes?
A. Yes, correct, yes.
Q. That's just the lawyer in me. If they're actual notes I'd want to see them. So then did you review any documents in order to prepare?
A. No.
Q. Does Locust Medical have an office?



A. Yes.
Q. And is that office in an office park or does it -- do you work out of your house?
A. No, no, it's an office, yes.
Q. And is that in Clinton, West Virginia?
A. That is correct, yes.
MR. PARONICH: And, Susan, this will be Exhibit 1.
THE COURT REPORTER: Okay.
(Document marked as Spadaro. Exhibit 1 for identification)
Q. Mr. Spadaro, are you on a computer?
A. Yes.
Q. So you just -- you just got an alert in the chat function on your screen and there should be a PDF that you should be able to click?
A. It says the word "Susan" but I don't see a document.
Q. Interesting. So I -- does everyone else have access to the document?
(Off record)
Q. So Mr. Spadaro, were you able to access that notice of deposition?
A. It just states about oral deposition, correct?



Q. Yes, it's a single page document.
A. Yes, it's got today's date, yes. That has to be it.
Q. That's right. It says dated April 28, 2023?
A. That's correct.
Q. And so you understand that this is the document that's required your appearance here today?
A. Yes.
Q. And again other than your lawyer have you had communications with anyone else about this deposition?
A. No.
Q. Did the other employees of Locust Medical know that this deposition is occurring today?
A. No.
Q. Are those two employees?
A. Yes.
Q. And so I believe you had testified earlier Mr. Spadaro that Locust Medical provides products and services in numerous states, correct?
A. That is correct, yes.
Q. Does Locust Medical provide services in every state?
A. No.



Q. Is that a business model decision or a licensing issue?
A. It is both, so depending on your licensing where you're allowed to distribute and also on logistics as well, too.
Q. Understood. So what was the licensing process to be able to distribute?
A. The licensing process to be able to distribute requires you to be certified by a company. The certification company has to be approved by the insurance providers such as any PPO, HMO, Medicare, Medicaid. Once they give your approval and everything is fine then you're all set to become a supplier.
Q. And is it an application that you filled out online?
A. No, I mean it's -- it could be submitted electronically but in order to become a licensed facility you have to be inspected by the company that's going to basically vet you or represent you and then you're also inspected by CMS which represents Medicare, Medicaid, and so on and so forth along with the private insurance companies.



MAGNA LEGAL SERVICES

Q. Understood. So whose the company that inspected Locust Medical?
A. To be able to apply for the license, it's called a BOC, which is the Board of Certification. And then once that's completed then you would be certified again and that would be by CMS.
Q. So the board of certification, is that in each state that Locust Medical applies?
A. No, board certification is nationwide so it didn't matter where you're based at.
Q. What was the process for licensing for certification for Locust Medical?
A. You have to meet all the criteria in terms of the facility, what you're going to offer, do you have the correct personnel for the type of licensing that you're going to receive. And basically that's -- that pretty much sums it up. As long as you meet all the criteria and everything is fine then you can proceed through.
Q. Are the criteria public?
A. Yes, yes.
Q. And do you know where that criteria is



available?
A. I think you could gain access to it through their website.
Q. And did the BOC or CMS impose any requirements with respect to how Locust Medical markets its services?
A. No.
Q. Okay. How does Locust Medical advertise services?
A. We get a lot of referrals. Basically in the community we've published ads, word of mouth referrals, we get a lot of walk-ins. And other than that we use a marketing company that will work for us and do the marketing side of things.
Q. So whose doing the referrals?
A. So if a patient comes in and says I need this type of product, they'll say, you know what, the local supplier closed, Locust is open. They're down the road. You could get a referral there. That's a referral that way. Another is a patient speaking to another person, hi, I'd like to get the device or supplies that you have. Where do you get it?



That's word of mouth. We don't pay for those referrals. It's just a personal referral.
Q. Understood. And those physicians and doctors are kind of the same ones you talked to before starting the business?
A. Correct, yes.
Q. And then you also mentioned published ads, correct?
A. Yes, we have public published ads in the newspaper where people could come in and try the product and see if it would work for them.
Q. So since 2020 how many marketing companies has Locust Medical worked with?
A. Two marketing companies.
Q. Is one of them Central Track?
A. Yes.
Q. And whose the other one?
A. The other is -- I'm trying to think of the name of it. I'm sorry. Give me one moment. One moment. I'm looking at something.
Q. My suggestion would be let's take a two minute break if you need to refresh your memory?
A. Yes, absolutely.
(Recess taken)



MR. PARONICH: We'll go back on the record.
Q. Other than Central Track whose the marketing company?
A. It's called Clyrex.
Q. Could you spell that for me, please.
A. C-l-y-r-e-x.
Q. Okay. And so can you explain to me that if a consumer is interested in getting some of this medical equipment, how is the consumer charged?
A. You mean how they get charged?
Q. I do.
A. If their insurance covers it their insurance could covered all or some of it. For example if they have a deductible or a secondary which would be a code payment, in some instances patients have to pay completely out of pocket so it's all determined on what the insurance coverages are, it will pay for it and if it's approved and accepted by insurance.
Q. Okay. Understood.
Do each of the companies have a contract?
A. Yes.



MAGNA LEGAL SERVICES

Page 18

Q. Do any of the companies have a restricted marketing clause?
A. Absolutely.
Q. What were some of those restricted marketing clauses as you recall?
A. One of the restrictions was for the campaign, is what they'd call it. The campaign is only for opt in and it's specified for the regions within we work and that's pretty much it. They should know automatically which is also in there what's called the TCPA, which is the telephone consumer protective clause, so they need to qualify and if they're a licensed center. They already know the information and it's all specified in the contract and their the ones responsible and they should follow the guide lines that are in the TCPA.
Q. Understood. And do you still work with Clyrex and Central Track?
A. No, I do not.
Q. Do you work with either of them?
A. No, neither one.
Q. And you had mentioned that one of the clauses in the contract was that the called recipients

Page 19

need to be opt ins, correct?
A. That is correct, yes.
Q. And what is your understanding of what that means?
A. So an opt in could be either from -- for example, somebody saw a commercial on TV, called into a phone number or they went to a website and they gave consent and they're interested in receiving product or services, you know, it could go for many different companies, that's my understanding of what an opt in was.
Q. Understood. And was it your expectation that if the marketing companies had acquired opt ins, that they would then at that point make telemarketing calls on Locust Medical's behalf?
A. That is correct, yes.
Q. How did you find -- I'll start with Clyrex actually. How did you find Clyrex?
A. Honestly, I don't recall. Sometimes it could be somebody calling us or sending a fax to our office wanting to provide marketing services. That's typically what you're going to get a lot of calls at a business. So --

Page 20

Q. And have you gotten a -- has Locust Medical gotten a lot of solicitations looking for marketing companies to do business for them?
A. We do. Not a lot, but we do.
Q. And out of all those solicitations Locust Medical has only attracted Central Track and Clyrex?
A. Yes.
Q. And does Locust Medical train the companies so they are knowledgeable about the Locust Medical product that they're offering?
A. Yes, because they are experienced with these types of products already.
Q. I didn't mean to interrupt you.
A. That's okay. Some companies do certain types of testing on medical products so they would already have a knowledge and testing of what our products are.
Q. So before hiring Clyrex and Central Track Locust Medical wanted to find a call center to --
A. I'm sorry. Did you say we were wanting to or they were?
Q. My question was: Did Locust Medical look for

Page 21

companies that specialized in this type of product?
A. No.
Q. And is that because the marketing companies found Locust Medical?
A. Correct. We were the one that received the contact; we don't reach out to companies.
Q. So then if the companies had experience with the medical product that Locust Medical offered what information did you have to provide to them?
A. We don't provide any information to them such as patient information or anything else. As long as they have an understanding of what the products are, then it's up to them to do the marketing themselves. We don't give them any information.
Q. So you don't provide them any scripting for their calls?
A. Absolutely not. We're not a call center. We're a supplier.
Q. But did Locust Medical review any of the scripting or materials they would be using to market?



MAGNA LEGAL SERVICES

Page 22

A. No, the only stipulation that we have is that when they're calling or speaking to anyone they're not allowed to say they represent an insurance company, they're not allowed to say they represent Medicaid or Medicare because that would be fraudulent. So as long as they're sticking to the confines of where they're from and what they're doing, that's okay.
Q. And did you provide both Central Track and Clyrex with that instruction?
A. To not name and represent that they're working for insurance companies, yes.
Q. And is that a licensing or regulation requirement?
A. I don't believe that it is but there's possibilities for fraud and misleading people so that's why we make sure we don't want to have an incident where someone believes they're taken advantage of.
Q. So your instruction is what you believed to be a best practice in the field?
A. Not really, but there's a possibility for it so we just want to make sure that that's never

Page 23

mentioned that you're representing somebody that just -- you're just not associated with because everybody's heard of this before.
Q. So did you terminate the relationship with Clyrex or did they terminate the relationship?
A. No, we terminated our relationship with Clyrex.
Q. Why did you do that?
A. We felt in our opinion that the quality of what they were presenting to us would not be factual and we had concerns, not about the opt in itself, but we just had concerns of possible people not really having an interest in a product or something like that.
Q. But you said that you didn't have concerns about the opt in?
A. Yes, we had -- no, no, let me rephrase that. There's no concern about the opt in itself, the patient saying, you know, they're opted in, but the concern was is this person actually going to use that product? Would it be beneficial to them?
Q. So is what you're saying that the candidates that they were delivering to Locust Medical weren't necessarily good candidates to the

Page 24

product that Locust Medical offers?
A. There was not -- it would not be deemed a medical necessity. For example, if you have a certain illness you're not going to be able to use a product. If you have scoliosis some products might not work for you. If you're a certain type of diabetic some supplies are not going to work for you, so basically the individuals were not fitting the criteria where they would be accepted.
Q. Understood. And is the criteria that Clyrex needed to meet in order to have the potential client be someone that's a good fit for Locust Medical, is that criteria that you supplied them at any time?
A. Not in regards to -- there are -- there is some information, you know, for example they have to have some sort of an ailment but to a degree; for example, there has to be a medical necessity for somebody to receive a product. If they don't have that they do not receive it, or they might be taking a medication, something to that effect.
Q. Understood. You said the issue with Clyrex,

Page 25

though, was not related to the opt ins for telemarketing calls they were using, correct?
A. No, yes, there was no issue with that.
Q. Did you review the opt in that Clyrex was using to generate the individuals that they were calling?
A. Individually?
Q. No. That's a good clarifying question. Let me ask a better question then. Explain to me the opt in Clyrex was using to make calls to -- for Locust Medical?
A. They have different avenues for opt ins they can use. For the requirement we receive, it will need to have what's called a time stamp on it. As long as it has a time stamp, then that's a recording of the actual opt in itself.
Q. But that option would be on solicitation calls that Locust is making for Locust Medical because that's the call that's recorded, correct?
A. When they're doing the opt in call they're actually calling somebody back that submitted a query to say they're interested in a medical product. That query could go out to several



MAGNA LEGAL SERVICES

marketing companies, and the marketing companies are the ones that will follow up on these options, and -- to see if there is an interest or a fit and bring it to us if it is.
Q. And how do you know that the individual that Clyrex was calling on Locust Medical's behalf submitted a query?
A. There's a stamp and an opt in that comes through with it.
Q. In the event of that opt in, that was occurring prior to the call that was going to be submitted to Locust Medical?
A. Correct, yes; they send it over with it.
Q. And for those opt ins, did Locust Medical review the purported consent that led to the call to ensure that it was compliant with the TCPA?
A. Let me rephrase. When it is transferred over to us, there is a time stamp on it sent over to us. But in regard to the actual opt in, Locust Medical as the supplier, we do not get into the marketing side of things and we do not need to see the actual opt ins as stated in our contract; the marketers know they all have to



be opt ins. Now in the event we would need to see an opt in we would put in a question to have that file sent to us showing the actual opt in itself. But we don't need to have access to every single one. Wear not required to.
Q. What do you mean you're not required to?
A. We're not required to have all opt ins on file.
Q. And by --
A. On our file.
Q. Understood. But you're saying not required to. Who is --
A. The marketing agency would be required to have that on file.
Q. And the marketing agency is making calls on Locust Medical's behalf, correct?
A. The management agencies are making calls on behalf of several companies; they're not dedicated to working exclusively for us. So they might have contracts with several other suppliers.
Q. But Clyrex did have a contract with Locust Medical where it was making calls and then providing clients for Locust?



A. Yes.
Q. So with respect to the potential queries that led to the calls, did you see evidence of those queries that were submitted?
A. When you say "queries" are you talking about the opt in itself?
Q. Yes, but what I mean is the query would be the purported visit to some kind of website that then led to the marketing company making a call. So I'm --
A. Yes, correct. And the marketer, as I mentioned, they maintain that information; we do not maintain that information.
Q. I understand that. You don't maintain it. But did you review any of it?
A. No, we don't.
Q. Did you review any of it for Central Track?
A. No, only in this one case.
Q. How is Clyrex paid?
A. In regards to how they operate they are paid on an hourly basis.
Q. How long did Locust Medical work with Clyrex?
A. Let me see. A little over two years.
Q. When did Locust Medical start working with



Clyrex?
A. That would have been, I'd say possibly around August of '20.
Q. And the relationship ended in 2022?
A. It ended in 2023, this year.
Q. Where is Clyrex located?
A. I don't know. I don't have the information in front of me.
Q. Well, do you have any documents that would show where they're located?
A. Not in front of me, I don't.
Q. Did you ever talk with any Clyrex employees on the phone?
A. Yes.
Q. Did you e-mail with Clyrex employees?
A. I believe in the beginning when we started the contract, yes.
Q. So starting the contract in 2020 and you're e-mailing with them and during the next two years when you're working together would you text message each other?
A. Yes, they could send messages to us, correct.
Q. And how would they send messages? Did you use texting or some other medium?



MAGNA LEGAL SERVICES

A. Texting.
Q. And who is the individual who would text you?
A. Again, information I would have to go back and pull up.
Q. But you have copies of --
A. I can get access to that, I guess.
Q. Do you remember were there multiple individuals from Clyrex that would text you or just one?
A. No, just one.
Q. And what was his or her name?
A. That's what I stated; I don't recall his name right off the top of my head.
Q. So if Clyrex was paid hourly, would they only be calling Locust Medical during the hours that they were being paid?
A. I don't know their actual business. They could be calling other people at the same time. We're not in their facility to actually see what they're doing.
Q. And do you know where their facility is?
A. No, I do not.
Q. What was your understanding of how much you paid them per hour?
A. It would be based on the per hour for calls and



what they used to make the calls.
Q. Do you have any idea what equipment they used to make the calls?
A. No idea.
Q. Did you ever ask?
A. No.
Q. Did you ever ask if there was a relationship with another company that supplied them?
A. No.
Q. Did you ever see if any of the calls they were making were on the National Do Not Call Registry?
A. No.
Q. Did Locust Medical have a lawyer review or audit their business practices?
A. No.
Q. Who drafted the contract that Clyrex signed?
A. The contract, I believe it was drafted by a lawyer that had worked in this before that was supplied to me.
Q. Was it a lawyer that Locust Medical hired or was it --
A. No, it wasn't a lawyer that Locust Medical had hired; it was a lawyer that had created one for



another company that is also a supplier and it was provided to me at no cost.
Q. Understood. Who was the lawyer?
A. I don't recall. No idea. I could find out but off the top of my head I don't know.
Q. Could you find out because it was e-mailed to you presumably.
A. No, it wasn't sent to me by a lawyer; it would have been sent to me through another supplier.
Q. Who was the other supplier?
A. Again, I don't know. This is from three years ago. I don't have the information in front of me.
Q. Understood. In terms of Locust Medical's relationship with Central Track and Clyrex, did Locust Medical have any analytics that they would run to measure Clyrex or Central Tract's performance?
A. We check for certain things; for example, if there's any type of a complaint lodged or anything like that then we'll tell them, hey, there is a complaint lodged and we'll make note of that and let them know.
Q. How did you let them know there was a complaint



lodged? Would you e-mail them?
A. No, text.
Q. And is that also how you would let Central Track know there was a complaint?
A. Not every complaint, no. Let me rephrase that. Let's say if you have a complaint ratio that would be over three percent or something like that, you would just offer, you know, not a warning, but you would state, you know, you've had some returns or complaints, please take a look at this. And your number is increased or we see something wrong then, we will suspend you and take a review if necessary, take action.
Q. And you would send that by text message?
A. Correct.
Q. And that's to both Central Track and Clyrex?
A. Correct.
Q. What are the type of complaints you received? You used a three percent ratio, correct?
A. Correct.
Q. And what kinds of complaints would be received?
A. Complaints could be a device is not the right size, didn't fit correctly, not the correct



MAGNA LEGAL SERVICES

material that they might think it would be. That would be your typical type of complaint.
Q. In terms of managing the relationship with Central Track or Clyrex, would both the employees and yourself participate in that?
A. No.
Q. Earlier in the deposition we talked about different types of ways that Locust Medical secures clients, referrals, published ads, walk ins and marketing companies.
Roughly what are the percentage of Locust Medical's clients that came in through the marketing companies?
A. It could be around 70 percent.
Q. But Locust Medical doesn't work with any marketing companies currently, do they?
A. Yes, we do.
Q. What companies did Locust Medical currently work with?
A. Locust Medical is working with a company called In called.
Q. Is that the letter N, C-A-L-L?
A. In Call, I-n, C-a-l-l.
Q. And so when did Locust Medical start working



with In Call?
A. I believe the time frame for them was the time that Clyrex went out. We were basically replacing that slot on the contract.
Q. So we're looking at early 2023 until current day?
A. That's correct, yes.
Q. I'm not going to go through all the questions again so I'll try to be efficient. Does In Call also communicate with your company through text messaging?
A. Correct, yes.
Q. So the same process of if there are complaints coming in, you know, In Call will respond to that also via text message just like Clyrex would?
A. That is correct, yes.
Q. And how did you find In Call? Did they contact you?
A. Yes.
Q. What about In Calls presentation made you go with them and end the relationship with Clyrex?
A. Just a lot of experience and vertical; they had a lot of background experience with medical



equipment so I believe they were a good fit.
Q. And so In Call is currently making telemarketing calls on Locust Medical's behalf?
A. Correct, yes.
Q. Are they also paid hourly?
A. Yes, they are.
Q. Does Locust Medical know where In Call obtains the telephone numbers that it makes telemarketing calls to?
A. Oh no, if it's an opt in it's up to them where they get that source from. We don't know.
Q. But does Locust Medical perform any reviews to ensure that they're actually securing opt ins?
A. No, it's stated in their contract that we only accept opt ins.
Q. And so is the answer the same with respect to Central Track that Locust Medical stands by its contract that they say they're opt ins but the company doesn't secure opt ins?
A. That's correct.
Q. Does Locust Medical maintain a local do not call list?
A. In terms of your question, in regards to a patient because our office does not make



outbound calls. But let's say for example if a patient says "I don't want this product. There's no need to follow up to let me know about the future." In that case we do.
Q. But Locust Medical maintains third parties to make telephone calls on their behalf, correct?
A. Yes.
Q. So if Clyrex is getting paid hourly by Locust Medical they're making outbound calls and a consumer says they're not interested in getting future calls, do you send that list to make sure that consumer doesn't get calls again?
A. No, it does not.
Q. Does Locust Medical have a written do not call policy?
A. No, we do not. Internally we can only make contact with patients so in our actual office our CSRs can make a call to a request with concerns but anything other than that, to follow up with a call they're not allowed to.
Q. Understood. But, again, Locust Medical does hire third parties to call customers, correct?
A. Yes.
Q. And, indeed, I think you said 70 percent of the



MAGNA Legal Services

Page 38

calls come from marketing companies?
A. That is correct. And the companies are to maintain the calls. They do not hand the file to us.
Q. Have you ever requested the file be handed to you?
A. No.
Q. In terms of TCPA compliance, is there anything else you'd like me to know about the steps to Locust Medical takes to try to comply with the TCPA?
A. No, as long as the marketing companies are following that and not violating it and ensuring they're calling the opt ins and can provide the proof of the opt ins, we're satisfied.
Q. And how many opt ins beside Mr. Jackson has Locust Medical required proof of?
A. Zero.
Q. So Mr. Spadaro, do you understand that you're still under oath?
A. Yes, I do.
Q. And can you explain to me how Locust Medical got connected with Central Track?

Page 39

A. Most likely they contacted our office and offered services.
Q. And with respect to Central Track, specifically, do you recall how your offices were contacted?
A. No, again my apologies because this is three years ago, so I can't recollect.
Q. That's fine. I understand. So I know when you started -- when Locust Medical started doing work with Clyrex. When did Locust Medical start doing work with Central Track?
A. Central Track would have been in 2020 right around the same time so I would actually say possibly around September of 2020.
Q. And when did the relationship with Central Track end?
A. The relationship with them ended -- I believe it was December or January of 2023 or December of 2022.
Q. So did Locust Medical keep doing business with Central Track during this lawsuit?
A. Yes.
Q. Why did the relationship with Central Track end?

Page 40

A. They had closed up their company. I wasn't given a response to that but I guess they dissolved their company.
Q. Does Central Track, Clyrex and In Call, all deliver potential customer information to Locust Medical the same way in terms of how the data is delivered to your company?
A. Yes, it's delivered the same way, correct.
Q. How is it delivered?
A. The information itself when there is somebody that's interested, it is sent to a verification department, and if everything is fine from there, it's all done electronically and if the order is verified, for instance, the verification department, they want to make sure that the order is legitimate. There's not a complaint attached to it or anything of that nature. As long as the potential customer agrees to all that, then the order can go through and be processed.
Q. Understood. You said "verification department." Is that a part of Locust Medical or is that a third party company?
A. No, it's a third party.

Page 41

Q. And who was that third party?
A. I'll have to get you that information.
Q. Has it been the same third party company since 2020?
A. No, it is different, yes.
Q. When did it change?
A. At the time that this occurred, back in 2021 it was internal so it would have been a Locust Medical employee that would have received that call to verify that it was something that a person wanted. And then going forward from there is a third party verification company that we use that fulfills those orders.
Q. Understood or -- I shouldn't say I understood. So is that before it was a third party company it's something that Locust Medical did internally?
A. No, for example, sometimes let's say the third party is not available and for example in this scenario third party wasn't available so this was something that was sent to a verifier that worked for Locust to verify the information is right, that the person is in need of the product, and making sure that everything is



MAGNA LEGAL SERVICES

Page 42

correct before they would send it through and process it or begin to process that order.
Q. Understood. So if the verifier is unavailable, how is the potential customer's information transferred to Locust Medical? Is it a telephone transfer?
A. Correct, yes. It is a telephone transfer, that is correct. It's a telephone transfer and it's a recorded line, too. So in the event that somebody says hey, who's this person calling me, we could refer them right back to the marketing agency. This is the person that called you. Would you like to file a complaint? We want you ensure that we're going to be processing this order and submitting it for you. Is this a legitimate order? Do you have any questions or concerns? That's the purpose of the verification is to make sure it's a legitimate order and there's no issues. So if somebody needed to make a complaint then they could be able to tell the verification they had a complaint and they can do it at that time.
Q. And what did Locust Medical ask Central Track

Page 43

about their marketing practices?
A. I don't understand. Their marketing practices?
Q. Yes, that's a fair clarification question. In terms of how Central Track was going to be generating potential customers for Locust Medical was it through telemarketing calls?
A. Under my understanding yes, but there could be different verticals to that as well. I'm not clear on that. There's nothing outlined that, you know, we needed to go over. They could do it by websites or whatever else, the marketing agency, so they would set that up.
Q. But you testified your understanding was it was through telemarketing calls. So what was the basis for that understanding?
A. My understanding is, yes, it's done through telemarketing calls. But they could also solicit through websites and create opt ins through websites. So people could visit websites they could potentially own and place information to them and place a follow up call to them. So, ultimately, then it is telemarketing.
Q. And I believe your testimony earlier was you

Page 44

never reviewed any of the sources from which Central Track obtained the telephone numbers it made telemarketing calls to, correct?
A. That is correct.
Q. Did you ever speak to the owner of Central Track?
A. Yes, I have.
Q. And what was that individual's name?
A. Kevin.
Q. Is that Kevin Moore?
A. Off the top of my head, I don't know his last name. His first name is Kevin.
Q. Did you ever speak to any other employee of Central Track?
A. No, no.
Q. Where was Central Track located?
A. I don't know. It was either California or New York. I'm not sure.
Q. And did you ask them where they were located at any time during your business relationship?
A. No.
Q. How much money did Locust Medical pay Central Track?
A. They are paid on what's called a fair market

Page 45

value, and they're paid at a rate of $25 per hour.
Q. Understood. And so approximately over two years how much money did Locust Medical pay Central Track?
A. I have no idea off the top of my head. I don't know.
Q. Do you know if it was more than $100,000?
A. No, it's not more than $100,000, but I can't give you an exact figure.
Q. Understood. Do you know if it was more than $50,000?
A. I couldn't give you an exact number.
Q. But you do feel confident that it was less than $100,000?
A. I do, yes.
Q. Did Central Track get paid more or less than Clyrex?
A. It's the same rate.
Q. I should have asked a clearer question.
The total amount of money that Central Track was paid, do you know if it was more or less than Clyrex?
A. It would be more.



MAGNA LEGAL SERVICES

Q. And so did Central Track rate more customers for Locust Medical than Clyrex?
A. At certain times. It would fluctuate.
Q. But if Central Track was paid more money than Clyrex over the history of the relationship, did Central Track create more customers than Clyrex?
A. I believe that's correct.
Q. Was In Call paid the same amount of money that the other two were?
A. Yes, it is.
Q. So I believe you testified earlier that Central Track had closed its business in 2023, correct?
A. Yes, 2023.
Q. How did you learn about that?
A. I was told in December that they were -- I believe it was December that they were ceasing operations.
Q. How were you told? Was that either text message or phone call?
A. Text message.
Q. So if I wanted to see a copy of the communications you've had with Central Track would the primary form of those communications



be text messages between you and Kevin?
A. Correct, yes.
Q. Did you ever exchange e-mails with Central Track?
A. No.
Q. How did Central Track sign the contract?
A. It was -- it would have been possibly faxed to us.
Q. Okay. Did any other employee speak with -- of Locust Medical speak with Kevin about --
A. No.
Q. When Locust Medical was named in this lawsuit did you have a discussion with Kevin about that?
A. I had the discussion when we received the complaint. And when we received the complaint they were notified about it, and after things pursued then we asked for proof of opt in because we wanted to do due diligence on our side to make sure we're covering all the bases. We had to make sure that the contact we had with them was not voided.
Q. And how did you have those discussions with him?



? Was it via text message.
A. Yes.
Q. So when Locust Medical was named in a federal class action lawsuit for having marketing companies contact individuals on the National Do Not Call Registry, did you review any of the other numbers that Central Track called to see if they were also on the Do Not Call Registry?
A. No. Let me explain. If someone is on the registry it supercedes the opt in and it supercedes the Do Not Call Registry.
Q. What's the something --
A. You're getting consent and --
Q. What type of -- go ahead.
A. The consent could be a written consent or an oral consent as well, too.
Q. Your understanding is that oral consent negates the National Do Not Call Registry?
A. To me the way that we operate it is to be a written consent that we would receive.
Q. Understood. And so when Locust Medical was named in a telemarketing class action lawsuit in federal court, did it review any of the other written consents for the calls that



Central Track was making on its behalf?
A. No.
Q. Why not?
A. We didn't feel that there was a need to. Once they had provided proof to us that there was an opt in, it satisfied us.
Q. Understood. And have you seen a copy of the affidavit provided about that opt in from a third party in this lawsuit?
A. I did, yes.
Q. And when you read that did you have a subsequent conversation with Central Track about it?
A. I -- yes, actually I did. I mentioned it to them, yes.
Q. And was that via text message?
A. Yes.
Q. And you have copies of all of the text messages you've had with Kevin, correct?
A. I'm not sure. I don't know.
Q. Well, while this lawsuit was pending, did you preserve the communications that you had with Central Track?
A. No. It's just text messages.



MAGNA LEGAL SERVICES

Page 50

Q. Right. But the communications included text messages, correct?
A. Yes, it's text messages, yes.
Q. And you haven't deleted the text messages you had with Kevin during this lawsuit?
A. I don't have contact so I don't have his information anymore. If I stopped doing business with him since December, I had -- I have no future contact with him.
Q. I understand you haven't had communication with him since December, but that's different with Locust Medical having a relation with Central Track.
You haven't destroyed the text messages you've had with him, have you?
A. I haven't destroyed them, no.
Q. You haven't deleted them, have you?
A. No.
Q. So when you had a conversation with Central Track regarding the affidavit what did Kevin say?
A. Regarding the affidavit, are you referring to the one from Torch Light?
Q. I am.

Page 51

A. Okay. What was explained to me is that even though Torch Light is an opt in provider, this data, so you can understand, can be sold to a new company, not necessarily Central Track; other companies can re-sell it again as sort of like distributors. So he had purchased it for somebody other than Torch Light.
Q. Who did he purchase it from?
A. I have no idea. I don't know. He ceased communication with me.
Q. And did he cease communication with you shortly after you showed him an affidavit from Torch Light saying that the lead was generated, did not consent to be contacted about Locust Medical's services?
A. No, no, he just abruptly ended the contact.
Q. Did Locust Medical ever recommend Central Track services to any other company?
A. No.
Q. Did any other employees of Locust Medical have communications with Central Track via text message?
A. No, never.
Q. Okay. I'm going to introduce the second

Page 52

exhibit here. Do you see it?
(Document marked as Spadaro Exhibit 2 for identification)
A. I do.
Q. So do you have a 34 page PDF there?
A. Yes.
Q. And do you recognize this document?
A. I do, yes.
Q. And do you recognize this document as discovery responses that you signed in connection with this lawsuit?
A. Yes.
Q. So first I'm going to go down to Page 2.
A. Okay.
Q. So we're on page 2 of this document. Are you able to go down to Page 2?
A. Yes.
Q. Do you see three lines down where it says bold underline "answer"?
A. Yes.
Q. Could you actually just read that two sentence answer for me, please?
A. Page 2?
Q. Page 2 of the PDF.

Page 53

A. Okay.
Q. And it's the first line. It says, "Answer: Defendant did not make telemarketing calls." If you could please read that, that three sentence answer.
A. "Does not make telemarketing calls. Vendor provided marketing services are through Central Track LLC, 30 North Gold Street." And then the phone number, 307-202-8332, info@centraltrack.com. The system used is believed to be Vicidial. But answering defendant is not privy to direct knowledge and at the same time not kept within defendant's regular course of business nor is it accessible to the defendant."
Q. Sorry. Thank you for reading that. And I promise I won't make you read other answers. I just wanted to make sure I understand.
That telephone number for centraltrack.com is the telephone number that you would exchange with Kevin at or is it a different number.
A. It would be -- could be. I'm not sure off the top of my head.



MAGNA LEGAL SERVICES

Q. Understood. So it does say the systems used is believed to be Vicidial so what's the basing for that belief?
A. That's what a lot of the companies, they use. It's a dialer system.
Q. And do you know the difference between the open source Vicidial system and the hosted Vicidial system?
A. No, I do not.
Q. Okay. I'm going to go down to page 29?
A. Okay. Page 29.
Q. Actually 27, sorry. 27.
A. Yes.
Q. Do you recognize this document?
A. Yes.
Q. And what is it?
A. This is a contract agreement.
Q. And is that between Locust Medical and Central Track?
A. Yes.
Q. Now I'm going to go down to page 30 which lists -- which starts with "campaign details." Could you let me know when you're there?
A. I am, yes.



Q. So can you explain to me with with respect to the business relationship between Locust Medical and centraltrack.com what campaign details are?
A. Campaign details are the verticals. So that is -- these would be consumers that could be potential customers.
Q. I'm not sure I understand. You're saying the campaign details -- oh, it's information to try to secure potential customers for Locust Medical?
A. That's correct.
Q. Got it. So there's a geographic target line, do you see that?
A. Yes.
Q. I won't make you read it. It says, "US nationwide excluding D-M-E, M-A-C, jurisdiction, JD and states GA, AL, CT, until further notice." Did I read that correctly?
A. You did, yes.
Q. Can you explain to me what that means?
A. Absolutely. So the United States is broken up into jurisdictions. There are four jurisdictions across the US. Jurisdiction A



pertains to the Northeastern part of the US. Jurisdiction B is north central US, jurisdiction C is eastern and southern US, and jurisdiction D is pretty much comprised of the midwest going all the way to the west coast.
Q. When you say that the US are divided into four jurisdictions, is that for durable medical products?
A. It's for a lot of medical products, not just durable medical equipment.
Q. But the regions are for medical equipment?
A. Yes.
Q. So is this an instruction that Locust Medical gave Central Track?
A. It's basically stating that we do not provide services in regards to the west coast area or that part of the US. Because I mean basically it would take a week or so to ship a product. It's just not economical for us so we focus more on areas where the logistic would be better.
Q. Understood. So is this geographic target line, is this Locust Medical instructing Central Track for what states to call into?



A. It's not instructing; it's saying these are the areas we can expect. It's up to them or -- of how they're going to set up their lists, but it's stating that we do not operate in these states so it would basically be a waste of their time.
Q. Right. But if Central Track made calls into Georgia or Alabama for Locust Medical would they still get paid to make those calls?
A. No, they wouldn't because this is basically stating these are no call states. We don't provide service in those areas. They can call them if they want but we can't pay for the service.
Q. So another way, it's an instruction on what they have to do if they want to get paid under the contract, is that fair?
A. Yes.
Q. So then there's other geographical info, can you explain to me what that means? Let me -- strike that. I'd like to understand of what the information after "other geographical" means?
A. Sure. So the difference -- what they're saying



MAGNA LEGAL SERVICES

Page 58

when they're saying "03" is basically on licensing, so basically depending on the licensing we have, is we're allowed to -- we're licensed. It's pretty technical but what we're saying is we are licensed in the states not mentioned above, we have two different categories of licenses, which are considered OR 03 and OR 02 licensing.
Q. Understood. So in terms of an instruction for Central Track to get paid on the contract what do they have to follow with respect to this truck?
A. So I'm trying to explain it the best that I can to you.
Let's say, for example, a patient is in the State of Ohio. Ohio is a state that we can provide certain products under our license but other products we cannot. So in this scenario, we would say, we can supply a product that would fall under a category of OR 03; however any product that falls under an OR 02 category we are not listed to provide it in that state. Now, it's not listed as a bad state, it's listed as a good state, but it just comes down

Page 59

to licensing and what you're able to supply in that area.
Q. Understood. Thank you. The next line is demographic target, 65 to 84 years of age. So if Central track wants to get paid on the contract do they have to call people within that age range?
A. No, it does not.
Q. So can you explain what this demographic age means?
A. That's typically the age of the customers we have, but we do have younger patients that would benefit from this. But typically it's more geared toward this age range, people who are retiring or at retirement age. They're more in need of these products than younger people.
Q. So would it be a fair understanding is this demographic target is more of a suggestion of where the targets are, whereas the other ones are instructions where you have to comply to get paid?
A. Yes.
Q. Lead type, it says "raw web based often." What

Page 60

does "raw web" mean in this context?
A. My understanding of it is raw is my -- my definition of it would be when we're talking about an opt in, let's say if somebody goes to put in an opt in they might only put in certain information for it to be considered raw. Now when the marketing company is contacting them and following up with them, then at that time the customer would provide more information. So it would now turn from being just raw to having more information to it.
Q. Understood. And is this also an instruction on the type of lead that Central Track must generate to get paid under the contract or is it a suggestion of what's typically done?
A. It's a suggestion what typically is done and it really varies because what you're talking about -- when you say "raw" we're talking about what people want to submit online. Some people, yourself, myself included, I would not want to go online and submit a Social Security number for an estimate on windows, just to give you an idea. So it's at the consumer level of what they want to provide but in most cases

Page 61

they're going to provide raw information. I'm interested in this. I'm an opt in. And it's consumer initiated. And that would generate a call back to develop that in a raw lead, which means when they call, become a raw lead, the person interested would have to provide more information for that lead to continue.
Q. Understood. The delivery method says "Google Sheets." Could you explain to me what that means?
A. Yes, some of the information that's provided to us goes through Google Sheets.
Q. Is that the same for Central Track, Clyrex and In Call?
A. Correct, yes.
Q. So does Locust Medical have a Google Sheets for each company?
A. We do, yes.
Q. What information is contained on that Google Sheets for each company?
A. It is the information that's on an intake so that could contain information such as patient history, medications and things of that nature.
Q. Understood. And has Locust Medical ever taken



MAGNA LEGAL SERVICES

Page 62

the phone numbers from those Google Sheets and compared them to the National Do Not call Registry so they could know to make sure to have written consent for telemarketing calls?
A. There would be no need for us to do that.
Q. Why do you think there is no need that if an individual was on the National Do Not call Registry they need to provide their written consent, right?
A. Correct. But that's the marketing company's responsibility. We're a supplier, again we don't make any outbound calls. So that's the marketing company to make those calls and it's up to them to provide due diligence to be sure they're following the TCPA.
Q. But Locust Medical got sued in a federal court lawsuit for having companies make telemarketing calls on their behalf to the National Do Not Call Registry, correct?
A. This is an instance, yes.
Q. And they continued their relationship with that company that was making telemarketing calls on their behalf, correct?
A. Correct because they provided the information

Page 63

that was requested.
Q. In Locust Medical's view, did Central Track comply with the contract when they contacted Mr. Jackson?
A. Yes, they did. They provided the information as requested.
Q. And did Locust Medical get opt ins for other calls to individuals that were on the National Do Not Call Registry called by Central Track?
A. No.
Q. And is Locust Medical aware that that information was requested in discovery?
A. No, I'm not.
Q. Okay.
A. I can't recollect at the moment. I'm sorry.
Q. That's okay.
Did anything about the business relationship with respect to the telemarketing that Central Track was conducting on Locust Medical's behalf change after the filing of this lawsuit?
A. No.
Q. The parties continued their business relationship the same as they were before?

Page 64

A. Yes, once we received the information that satisfied us that everything was correct, then we continued.
Q. And then when Locust Medical received the affidavit disputing the lead from Torch Light it accepted the explanation that Central Track just purchased the information from another company?
A. That is correct, yes.
Q. And you don't know what that company is?
A. No, I don't. So that would be your definition why Torch Light says that they do not have an agreement with Locust Medical and that is true because we're a supplier. We're not a marketing agency.
Q. Right. But that's one of the statements that Torch Light made. Didn't Torch Light also say that it doesn't sell any consumer data that would give someone prior consent to make telephone calls for Locust Medical?
A. Right.
Q. And Central Track was making telephone calls for Locust Medical, correct?
A. That is correct, yes.

Page 65

Q. So if Torch Light was selling the data directly to Central Track or it was selling it to another company that sold it to Central Track that doesn't change the position of Torch Light that any of the data they sell doesn't represent prior expressed written consent for Locust Medical products or services to be advertised, correct?
A. I do not know.
Q. Did you say "I don't know"?
A. Correct, yes.
Q. Do you have any information or documents that dispute that estimate from Torch Light?
A. No, the only thing that I was told by Central Track is that they had purchased it from another company and most likely Torch Light had sold it to another individual.
Q. Understood. And I agree that that makes sense that that could have occurred, but my question was limited.
Do you have any documents or information to dispute Torch Light's estimate that they don't sell data to anyone --
A. No --



MAGNA LEGAL SERVICES

Page 66

Q. Let me just finish the question, please.
A. Sure.
Q. So do you have any documents or information to dispute Torch Light's estimate that they don't sell any data to anyone that represents prior consent for Locust Medical's products to be promoted on telemarketing calls?
A. No. Yes, I mean there would not be anything for Locust Medical because again we're a supplier and the marketing company would be representing -- I mean from their side they're representing, so we wouldn't be on that.
Q. Right. But the marketing company is making telemarketing calls to promote Locust Medical's products, correct?
A. Correct, yes.
Q. And do you have a different understanding of the restrictions of the Do Not Call Registry that the individual product being advertised needs to be explicitly listed, that's the prior consent requirement?
A. Could you say that again.
Q. Sure. So do you understand that in order to make a telemarketing call for the National Do

Page 67

Not Call Registry, prior express written consent is required?
A. Correct.
Q. And do you understand that that express part means the products or services being advertised needs to be mentioned in the consent form?
A. To my understanding, I would believe so.
Q. Right. Okay. What I'm saying is if Torch Light is saying that none of the data they sell constitutes prior express written consent for Locust Medical's products to be advertised, do you have any information to dispute that?
A. No.
Q. But Central Track told you that they got data from Torch Light, just not directly, correct?
A. That is correct, yes.
Q. And then after this lawsuit was filed --
A. I don't know -- sorry. I don't mean to interrupt. I don't know if the company name was Torch Light but in this instance I was told that the data was purchased from another company. So if it was saying Torch Light, it did not come from them directly.
Q. Understood. Right. And so Torch Light --

Page 68

strike that.
So then Central Track let you know that it purchased data from another company, correct?
A. Correct.
Q. But isn't your understanding of the purported opt in, the only opt in that Locust Medical has ever requested from Central Track came from a website owned by Torch Light?
A. Correct, yes.
Q. And so then when Locust Medical thought the only opt in its every received from Central Track they had now received an affidavit from Torch Light expressly disclaiming that it sold consumer data that allowed these telemarketing calls to be made, correct?
A. That is correct, yes.
Q. But still Locust Medical continued its relationship with Central Track nonetheless, correct?
A. Under the determination that the file was -- or the data was not purchased directly from Torch Light; it was purchased from another company. I did not see the part that they're saying

Page 69

that -- could you repeat that part, they don't sell consumer data?
Q. That's not what I said. But I'll be asking a different question it's okay.
So did you ever contact Torch Light directly to ask them about this data that was sold?
A. No.
Q. And you continued your relationship with Central Track. And I believe your testimony earlier was the reasons for the relationship ending had nothing to do with compliance with the TCPA, correct?
A. That is correct; there was no issue there.
Q. And Locust Medical has never reviewed another opt in from Central Track based on the two years of making telemarketing calls on their behalf, correct?
A. That is correct.
MR. PARONICH: Okay. So I'll be handing over the witness now. Mr. Spadaro, not often, but sometimes your own attorney may have questions for you. And if she does, then I get to ask more questions

about those questions. But for now I'm done with my questioning, and I appreciate your time.

CROSS EXAMINATION

BY MS. LUCCHESI:

Q. I'm going to be very brief. When you were investigating internally whether or not Central Track had the proper opt ins and things, they gave us paperwork but didn't they also give us two voice recordings, one of the order, and one of the verification of the order?
A. Yes, that is correct. We do have those on file.
Q. And we turned those over in discovery, is that correct?
A. Yes, I believe they were turned over. Yes, they were.
Q. And marketing companies, no matter who they are that you deal with, they're all independent companies; is that correct?
A. That is correct, yes.
Q. You're not on any of their boards?
A. We are not associated whatsoever.
Q. You're not an employee of theirs?



A. No, we are a medical supplier.
Q. Do you have any right to their internal corporate records that you're aware of?
A. Absolutely not.
Q. And you purposely don't have an internal marketing company to do this, is that correct?
A. Correct.

MS. LUCCHESI: That's all I have.

REDIRECT EXAMINATION

BY MR. PARONICH:

Q. So you said with these marketing companies you're not associated whatsoever, correct?
A. Associated in regards like I'm not an employee, I don't own an interest in the company.
Q. Understood. But they are a third party company that you have a contractual relationship with, correct?
A. That is correct, yes.
Q. And there are campaign details and instructions that are provided to the marketing company that they need to comply with in order to get paid, correct?
A. It's a guideline.
Q. But there are also some instructions that we



reviewed that if they don't comply they don't get paid, correct?
A. For example, when you're talking about the age group it doesn't mean they're not going to get paid for that; it's just more of a criteria for them to follow. It's not a set in stone guideline except for the state part, that is, saying that our license doesn't cover these areas.
Q. Understood. And I want to make sure we have a clean record; that there are some guidelines that you provide the marketing companies, correct?
A. Correct, on criteria.
Q. But there are also other instructions that if the marketing company does not follow they will not get paid, correct?
A. Could you give an example.
Q. The geographic territories are an example, correct?
A. Correct. If they go off course on that, then correct, they would not be paid for that.
Q. So again, there are criteria that are provided to the marketing company that if they fail to



abide by they will not get paid, correct?
A. Correct.

MR. PARONICH: So, Susan, do you want to do a read and sign on the record or does Magna need orders on the record?

THE COURT REPORTER: Orders on the record.

MR. PARONICH: For the plaintiff, we'll go electronic only, but with exhibits. And I'll take your whole electronic thing.

THE COURT REPORTER: And, Faith?

MS. LUCCHESI: Same, electronic only.

(Whereupon, the deposition was concluded at 10:45 a.m.)

I, GEORGE SPADARO, having read the foregoing transcript of my testimony, do hereby certify the same contains a true and accurate record of my answers to the questions herewith set forth, together with correction pages, if any, attached.

Signed under the pains and penalties of perjury this ______ day of ____________________, 2023.

______________________
Deponent's Signature

Subscribed and sworn to before me this ____ day of ______________, 2023.

______________________
Notary Public



E R R A T A S H E E T

| Page | Line No. | Reads | Should Read |
|---|---|---|---|

1.____________________________________________
2.____________________________________________
3.____________________________________________
4.____________________________________________
5.____________________________________________
6.____________________________________________
7.____________________________________________
8.____________________________________________
9.____________________________________________
10.___________________________________________
11.___________________________________________
12.___________________________________________
13.___________________________________________
14.___________________________________________
15.___________________________________________
16.___________________________________________
17.___________________________________________
18.___________________________________________
19.___________________________________________
20.___________________________________________
21.___________________________________________



CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS)
SUFFOLK, SS. )

I, Susan E. DiFraia, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, hereby certify that:

GEORGE SPADARO the person whose deposition is hereinbefore set forth, was by me satisfactorily identified by means of a Massachusetts driver's license, and was duly sworn to testify to the truth and nothing but the truth by me and that the foregoing transcript is a true and accurate transcription of my stenotype notes to the best of my knowledge, skill, and ability.

I further certify that I am not related to any of the parties in this matter by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 20th day of June 2023.

______________________

Notary Public
My commission expires 2025

*********************

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.



MAGNA LEGAL SERVICES